# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| REGIONAL DIRECTOR CORNELE A. OVERSTREET, <br><br> Petitioner, <br><br> vs. <br><br> AJNC INDUTRIES LLC d/b/a CLARK WELDING & FABRICATING <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) |

Case No.: 2:21-cv-00730-GMN-EJY

**ORDER**

Pending before the Court is Petitioner Cornele A. Overstreet's ("Petitioner's" or "the Regional Director's") Petition for Temporary Injunction, (ECF No. 1), which he brings in his capacity as the Regional Director of the National Labor Relations Board ("NLRB"). Respondent AJNC Industries LLC d/b/a Clark Welding & Fabricating ("CWF") filed a Response, (ECF No. 6), and Petitioner filed a Reply, (ECF No. 8).

Also pending before the Court is Petitioner's Motion to Try the Petition on the Basis of the Administrative Record, Affidavits, and Documentary Evidence, (ECF No. 3).  CWF filed a Response, (ECF No. 7), and Petitioner filed a Reply, (ECF No. 9).[1]

Also pending before the Court is Petitioner's Motion for Leave to file Excess Pages, (ECF No. 4).  CWF did not file a Response.[2]

For the reasons discussed below, the Court **GRANTS** the Motions to Try the Petition on the Basis of the Administrative Record and for Leave to File Excess pages.  The Court nevertheless **DENIES** the Petition.

---

[1] The Court finds the Petition suitable for adjudication without an evidentiary hearing and therefore grants the Motion.

[2] The Court grants the Motion as unopposed pursuant to LR 7-2(d).

## I.   BACKGROUND

This case arises from CWF's allegedly unlawful response to a union organizing campaign that began in July of 2020. (*See generally* Memorandum in Support of Pet. Temp. Inj. ("Pet. Temp. Inj."), ECF No. 1-1).  CWF provides HVAC services including boiler, installation, and fabrication in and around Las Vegas, Nevada. (Apr. 6 Admin. Hearing Tr. 33:1–20, PX 12, ECF No. 1-7).  CWF has approximately 24 employees, 14 of which perform boiler and other HVAC services. (*Id.* 480:8–10); (Aff. Austin Peck Dated Jan. 15, 2021 ("Jan. Peck Aff.") ¶ 10, PX 6, ECF No. 1-5).

In July of 2020, Austin Peck ("Peck") an organizer for 5 States Pipe Trades Association ("the Union") approached two CWF employees, Corey Beran ("Beran") and Craig Chapman ("Chapman"), at a job site during their lunch break. (Jan. Peck Aff. ¶ 2, PX 6).  Peck engaged the employees in discussion about what the Union could accomplish for CWF's employees, provided the employees with Union literature, and gave the employees his phone number. (*Id.*).  Peck then began communicating with Beran and Chapman on a regular basis. (*Id.*); (*See also* Aff. Austin Peck Dated Apr. 6, 2021 ("Apr. Peck Aff.") at 8–10, PX 8, ECF No. 1-6).  After meeting Beran and Chapman, other CWF employees including Anthony Scalzo ("Scalzo") and Tyler Christenson ("Christenson") reached out to Peck regarding their interest in the union campaign. (Jan. Peck Aff. ¶ 3, PX 6).

On September 4, 2020, Scalzo and Peck met at the Union's headquarters, where Scalzo signed a union authorization card. (*Id.* ¶ 4).  Christenson and Peck met at a restaurant the following day, and Christenson signed an authorization card at the meeting. (*Id.*).  As the support for the Union grew among CWF's employees, Peck started regularly keeping in contact with 10 employees, including Beran, Chapman, Rory Johnson ("Johnson"), Kevin Juarez ("Juarez"), Joe Childress, Matt Gonsalez, and Parker Elias. (*Id.* ¶¶ 5–7).  On September 8, Peck received an authorization card from Juarez. (*Id.*).  Around the same time, Chapman informed

Scalzo he was ready to sign an authorization card. (Apr. 6 Admin. Hearing Tr. 394:13–21, PX 12).

Meanwhile, as the Union began gaining support, employee Michael Ralls ("Ralls") was on vacation from September 2–7. (Aff. Michael Ralls ("Ralls Aff.") ¶ 5, PX 5, ECF No. 1-5). Christenson called Ralls about the Union campaign during his vacation, and Ralls expressed interest in the campaign and asked for Peck's information. (*Id.*). When Ralls returned, he discovered that he was not scheduled to work for the week of September 7 despite previously being told to return no later than September 7 because he would be needed to work on a large project in Henderson. (*Id.* ¶¶ 5, 8). On September 8, Ralls met with Peck and signed an authorization card. (*Id.* ¶¶ 9–10). After signing the card, Ralls contacted HVAC Supervisor Nilson to ask why he was not on the schedule for that week, and when Nilson could not provide an explanation, Ralls said he disagreed with the decision. (*Id.* ¶ 11). Ralls believes he was the only employee whose hours had been reduced during the week of September 7. (Apr. 6 Admin. Hearing Tr. 326:25–327:12, PX 12).

On September 9, Peck learned that employee Will Perks had informed CWF's owner-managers, Coltin Clark ("Coltin") and Austin Clark ("Austin"), (collectively, "the Clarks"), about the Union campaign. (Jan. Peck Aff. ¶ 8, PX 6). On the same day, CWF sent its employees a group text message informing them of an all-staff meeting on September 10. (*Id.* ¶ 9). While the meeting initially focused on complaints regarding cleanliness of work sites, the Clarks pivoted to "[t]he main reason we're doing this meeting," discussing the Union. (Tr. Meeting Recording 5:11–13, PX 10, ECF No. 1-7). The Clarks asked questions regarding the extent of the Union campaign, how the employees had been contacted, the effect unionizing could have on the availability of work, and the Union literature that had been distributed to employees. (*Id.* 5:12–7:4). After the September 10 meeting, Peck stopped receiving messages

from most of the employees with whom he had previously been in regular contact, and the Union's momentum stalled. (Jan. Peck Aff. ¶¶ 11–12, PX 6).

After continuing attempts to push the Union campaign forward, Peck and another organizer met with the Clarks to discuss whether the Clarks would prefer to avoid the expense of an anti-union campaign and instead recognize the Union as its employees' collective bargaining representative. (Aff. Austin Clark ¶¶ 2–3, PX 11, ECF No. 1-7).  The Clarks declined. (*See id.*).  Later that same day, when Ralls arrived to work in CWF's shop, Coltin ordered Ralls to his office. (Ralls Aff. ¶ 18, PX 5).  When Ralls arrived, he was confronted by the Clarks and Nilson where he was told he would be laid off because work had slowed down, and he would be rehired when work picked up again. (*Id.*).

After the Union campaign fizzled to a stop, an NLRB petition was filed.  The NLRB action alleges that CWF responded to the union organizing campaign by engaging in unfair labor practices prohibited under the National Labor Relations Act, 29 U.S.C. §§ 151, *et seq.* ("NLRA").  Petitioner now seeks a temporary injunction while the NLRB adjudicates the administrative action against CWF.

## II.   <u>LEGAL STANDARD</u>

The NLRA regulates relations between "private sector employers, labor unions, and employees." *See Chamber of Commerce of the United States v. NLRB*, 721 F.3d 152, 154 (4th Cir. 2013).  When enacting the NLRA, Congress intended to "restor[e] equality of bargaining power" between employees and employers by, "encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment." 29 U.S.C. § 151.  To that end, the NLRA prohibits employers from engaging in defined "unfair labor practices" that discourage or restrain employees from collective bargaining. *See* 29 U.S.C. § 158.  If an employer engages in

unfair labor practices intended to undermine a union campaign, the union may petition the National Labor Relations Board ("NLRB" or "the Board") for relief. 29 U.S.C. §§ 158–160. After initiating an NLRB proceeding, the Board may petition a district court for "temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j) ("section 10(j)").

"[W]hen a Regional Director seeks § 10(j) relief, he 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Frankl ex rel. NLRB v. HTH Corp.*, 650 F.3d 1334, 1355 (9th Cir. 2011) (quoting *Winter v. Nat. Res. Dev. Council*, 555 U.S. 7, 20–21 (2008)). "'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the [Regional Director] can support issuance of a preliminary injunction, so long as the [Regional Director] also shows that there is a likelihood of irreparable harm and that the injunction is in the public interest." *Id.* (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal modifications original)). Under either standard, the Regional Director "must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." *Alliance for the Wild Rockies*, 632 F.3d at 1131 (emphasis omitted); *see Small v. Operative Plasterers' Int'l Ass'n, Local 200*, 611 F.3d 483, 491 (9th Cir. 2010) (acknowledging that *Winter* abrogated the Circuit's previous rule that a mere "possibility of irreparable harm" may be sufficient).

## III.   **DISCUSSION**

Petitioner argues that CWF has engaged in unfair labor practices that violate §§ 8(a)(1) and 8(a)(3) of the NLRA. Petitioner contends that CWF has interfered with its employees collective bargaining rights in violation of § 8(a)(1) by: (1) interrogating employees about their union organizing; (2) describing the act of talking to union representatives while working as "illegal;" (3) threatening future job loss in the event of unionization; and (4) confiscating union

literature at an all-staff meeting. (Pet. Temp. Inj. 17:24–25:16, ECF No. 1-1).  Petitioner argues that CWF violated § 8(a)(3) by firing Ralls because he supported the Union. (*Id.* 26:1–33:20). Petitioner requests that the Court issue an order directing CWF to: (1) cease and desist from engaging in unfair labor practices; and (2) rehire Ralls to his former position. (*See* Proposed Order, ECF No. 1-10).  The Court's below discussion addresses whether Petitioner has met his burden to receive the relief requested, beginning with his likelihood of success on the merits.

### A.    Likelihood of Success on the Merits

To demonstrate a likelihood of success on the merits, the Regional Director must show a "probability that the Board will issue an order determining that the unfair labor practices alleged by the . . . Director occurred and that [the circuit] would grant a petition enforcing that order." *Frankl ex rel. NLRB v. HTH Corp.*, 693 F.3d 1051, 1062 (9th Cir. 2012) (quoting *Frankl ex rel. NLRB v. HTH Corp.*, 650 F.3d 1334, 1355 (9th Cir. 2011)).  A petitioner meets this burden by "produc[ing] some evidence to support the unfair labor practice charge, together with an arguable legal theory." *Id.* (quoting *Frankl*, 650 F.3d at 1356).

### 1.    8(a)(1)

Under § 8(a)(1) of the NLRA, "it [is] an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights [to join labor unions and collectively bargain.]" 29 U.S.C. § 158(a)(1).  "The broad purpose of § 8(a)(1) is to establish 'the right of employees to organize for mutual aid without employer interference.'" *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409 (1964) (quoting *Republic Aviation Corp. v. Labor Board*, 324 U.S. 793, 798 (1945)).  Section 8(a)(1) "prohibits not only intrusive threats and promises but also conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." *Id.*

Each of CWF's alleged § 8(a)(1) offenses occurred at the September 10 all-staff meeting.  At the meeting, CWF asked its employees who of them had been contacted by the Union. (Aff. Michael Ralls dated Oct. 12, 2020 ("Oct. Ralls Aff.") ¶ 14, PX 5, ECF No. 1-5); (Recording of Sept. 10, 2020 Meeting ("Meeting Recording") at 4:30, PX 9, ECF No. 1-8)[3]; (Tr. Meeting Recording 5:12–6:3, PX 10, ECF No. 1-7) ("The main reason we're doing this meeting is [Union] guys have been coming around to our guys, calling them, and I just want to know who all's been contacted by them. . . . Has anyone got any phone calls from anyone? . . . "Which jobsite [did they go to]? . . . They showed up during working hours while you were working?").[4]  When one employee volunteered that he had been approached at a job site during lunch, Coltin told the employees that the conduct was "illegal." (Oct. Ralls Aff ¶ 14, PX 5); (Meeting Recording at 4:51, PX 9); (Tr. Meeting Recording 6:1–9, PX 10) ("show[ing] up during work hours while you were working . . . . is illegal.  They can't contact you while you're on the jobsite, while you're working.").[5]

Ultimately, Coltin explained to the employees that it was their choice whether to join the Union, but he emphasized, "a lot of [the Union] guys are sitting at home right now." (Oct. Ralls Aff. ¶ 15, PX 5); (Meeting Recording at 6:30, PX 9); (Tr. Meeting Recording 6:21–7:4, PX 10).[6]  Finally, at the end of the meeting, Coltin asked an employee if he could "grab those [Union] pamphlets from you." (Oct. Ralls Aff. ¶ 15, PX 5); (Meeting Recording at 7:12, PX 9);

---

[3] CWF contends that "the surreptitious recording of the September 10, 2020 meeting, and the transcript of the same, are inaccurate and, therefore, not reliable[.]" (Resp. 12:15–20, ECF No. 6).  CWF articulates no basis beyond its mere assertion to doubt the validity of either the recording or transcript.  CWF's defense amounts to a serious ethical accusation, which is entirely unsupported by argument or evidence.  For the recording to be inaccurate, it would have to be manufactured or altered in some way.  Without supporting evidence to undermine the accuracy of the recording and transcript, the Court will not disregard the evidence.

[4] Petitioner argues that the questions constitute unlawful interrogation. (Pet. Temp. Inj. 17:17–19:15).

[5] Petitioner refers to the statement and prohibitory policy as coercive. (*Id.* 20:1–21:16).

[6] Petitioner refers to the statement as a threat of job loss and futility of union representation. (*Id.* 22:1–23:9).

(Union Pamphlets, PX 13, ECF No. 1-7).[7]  The Court considers whether Plaintiff has shown a likelihood of success that any of the alleged statements violate § 8(a)(1).

### i.   Interrogation

Employers may run afoul of § 8(a)(1) by questioning employees about their union sympathies if the questioning interferes with, restrains, or coerces employees in the exercise of their collective bargaining rights. *See Westwood Health Care Center*, 330 NLRB 935, 939, n.15 (2000).  Whether the employer's questioning rises to the level of unlawful interrogation depends on whether the totality of the circumstances demonstrate coercive behavior. *Rossmore House*, 269 NLRB 1176 (1984) *aff'd sub nom. Hotel Employees Union Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985).  Factors bearing upon the coerciveness of an employer's questioning (the "*Bourne* factors") include:

> (1) The background, i.e. is there a history of employer hostility and discrimination?
> (2) The nature of the information sought, e.g. did the interrogator appear to be seeking information on which to base taking action against individual employees?
> (3) The identity of the questioner, i.e. how high was he in the company hierarchy?
> (4) Place and method of interrogation, e.g. was employee called from work to the boss's office? Was there an atmosphere of 'unnatural formality'?
> (5) Truthfulness of the reply.

*Bourne v. NLRB*, 332 F.2d 47, 48 (2d Cir. 1964).  "[D]etermining whether employee questioning violates the Act does not require strict evaluation of each factor; instead, 'the flexibility and deliberately broad focus of this test make clear that the *Bourne* criteria are not prerequisites to a finding of coercive questioning, but rather useful indicia that serve as a starting point for assessing the totality of the circumstances." *Westwood Health Center*, 330 NLRB at 939 (quoting *Perdue Farms Inc. v. NLRB*, 144 F.3d 830, 835 (D.C. Cir. 1998) (internal citations and quotations omitted)).  The court's task is "to determine whether under all

---

[7] Petitioner refers to the request as unlawful confiscation and interrogation. (*Id.* 24:1–25:16).

the circumstances the questioning at issue would reasonably tend to coerce the employee at whom it is directed so that he or she would feel restrained from exercising rights protected by Section 7 of the Act." *Id.* at 940.

Petitioner contends that CWF violated § 8(a)(1) when, at an all-staff meeting, CWF's owners asked the employees who had been contacted by the Union. (Pet. Temp. Inj. 17:17–19:15). Petitioner argues that the purpose of the meeting was to unlawfully discern who had been in contact with the Union and the progress of the organizing campaign. (*Id.* 18:10–15). Petitioner characterizes the meeting as intended to "coerce both notorious and covert Union supporters for fear of being singled out and targeted." (*Id.* 18:15–17). Petitioner contends that given the abrupt scheduling of the meeting, that it was led by the co-owners of the business, and only two of the employees who had been contacted by the Union answered the Clarks' questions, the *Bourne* factors indicate that that questioning was unlawful interrogation. (*Id.* 8:16–9:15).

CWF responds that questioning employees only amounts to unlawful interrogation if accompanied by threats of discipline or reprisal, which were never uttered. (Resp. 12:27–13:6, ECF No. 6). CWF contends that several employees testified at the administrative hearing that they did not feel threatened if they decided to join the Union. (*Id.* 13:7–21). CWF further contends that it did not know individual employees' attitudes regarding the Union, indicating that CWF did not aim to restrain, interfere with, or coerce its employees from exercising their collective bargaining rights. (*Id.* 14:3–15).

Petitioner bases his unlawful interrogation theory on a brief portion of the meeting during which Coltin asked employees about the Union's organizing activities. Coltin opened the Union discussion by saying, "The main reason we're doing this meeting is [Union] guys have been coming around to our guys, calling them, and I just want to know who all's been contacted by them." (Tr. Meeting Recording 5:11–13, PX 10). Coltin then asked, "Has anyone

got any phone calls from anyone." (*Id.* 5:15–16).  When an employee responded that Union organizers contacted employees at a jobsite, Coltin asked, "[w]hich jobsite." (*Id.* 5:21).  When an employee provided the answer, Coltin asked whether, "[t]hey showed up during working hours while you were working?" (*Id.* 6:2–3).

   The Court finds that the totality of the circumstances indicate that the questioning did not likely rise to the level of unlawful coercion.  Petitioner provides no indication that the Clarks had demonstrated any hostility toward the Union prior to the September 10 meeting.  And, when questioning the employees about the Union, the Clarks did not single out any employees or seek information that would have allowed CWF to target individual employees for discipline.  The Clarks did not ask who supported the Union; rather, they inquired about who the Union had contacted and by what method of contact.  Although the owners of the business were the ones who sought the information at the meeting, the meeting lacked indicia of unnatural formality as the questions were raised at a teamwide meeting.  Petitioner presents no evidence that teamwide meetings were atypical at CWF.  Nor does Petitioner provide evidence that CWF rarely held meetings with just one-days' notice.  By nature, questioning employees as a group will generally fail to single out union supporters because, when employees are questioned as a group, the format diffuses responsibility in a manner that avoids outing union supporters.  Here, although only two employees volunteered the fact they had been contacted by the Union, all employees' responses were truthful; no employees lied about their Union contacts or support.

   At most, Petitioner has shown a likelihood that CWF's employees were dissuaded from unionizing after the meeting, but Petitioner has not shown that the Clarks' questions *coerced* employees into abandoning their Union campaign.  As the Court explained above, Petitioner's analysis of the *Bourne* factors is unpersuasive.  What remains of Petitioner's argument is circular: the Clarks' questioning was coercive because CWF's employees abandoned the union

organizing campaign.  However, when an employer asks questions about a union campaign, the subsequent failure of the union effort does not itself demonstrate that the questioning was coercive.  Rather, Petitioner must explain objective indicia that would cause employees to reasonably feel restrained in their ability to organize for mutual aid.  Here, sufficient indicia of unlawful interrogation are lacking because there is no evidence the meeting was unusually formal, the Clarks did not seek to reveal the identities of union supporters, nor did the Clarks threaten reprisal against employees who continued to organize.

### ii.    Prohibition

Generally, employers may prohibit employees from engaging in union-related discussions at times employees are supposed to be actively working so long as the prohibition extends "to all other subjects not associated or connected with their work tasks." *Orval Kent Food Co.*, 278 NLRB 402, 407 (1986).  However, it is an unfair labor practice to prohibit discussing unions where employees "are free to discuss other subjects unrelated to work, particularly where . . . the prohibition was announced in specific response to the employees' activities in regard to the union campaign." *Id.*

Petitioner argues that CWF unlawfully prohibited its employees from discussing the Union. (Pet. Temp. Inj. 20:1–21:16).  He contends that Coltin, in describing it as "illegal" for the Union to talk to employees at a jobsite, "promulgated a rule that unlawfully restricted employees from engaging in union activity anywhere, regardless of whether it was on working time or in a working area." (*Id.* 20:11–13).  Petitioner further contends that the framing of the discussion as "illegal" indicates that employees may be subject to discipline if they speak to or about the Union while at a work site, which damaged the Union's campaign and access to employees. (*Id.* 20:1–7).  Finally, Petitioner argues that CWF intended the rule to prevent unionization in response to an active campaign because it was implemented only days after CWF learned about the Union campaign. (*Id.* 20:8–7).

CWF responds that there is no evidence that it promulgated an overly broad policy prohibiting employees from speaking to or about the Union. (Resp. 14:17–15:13). CWF's argument essentially disputes Petitioner's framing of the evidence presented, arguing that Petitioner vastly overstates the implications of the comments at the September 10 meeting. (*Id.*). The Court agrees.

Petitioner does not contend that CWF allowed its employees to discuss non-work-related topics while in the field. *Cf. Teledyne Advanced Materials*, 332 NLRB 539, 539 (2000) (finding a union speech prohibition unlawful given petitioner presented uncontroverted evidence that employees "routinely talked about 'ball games, church, the weather' and other subjects" at work during working hours). Accordingly, the only alleged impropriety of the rule is its overbreadth and timing of promulgation. The Court finds that Petitioner has not shown the policy was overbroad because Petitioner provides no evidence that CWF extended the policy beyond times in which employees were actively working. To the contrary, the transcript of the September 10 meeting shows that Coltin described it as "illegal" for the Union to engage employees "during working hours while [employees] were working." (Tr. Meeting Recording 6:2–9, PX 10). The Court is not persuaded that describing policy violations as "illegal" renders the policy itself unlawful by causing a fear of discipline; employees likely fear violating any workplace policy because of the potential for discipline. Violating policies comes with consequences, and workplace policies relating to unions need not be consequence-free if the policies are lawful in scope. Finally, while the timing of a speech prohibition policy increases the likelihood that the policy violates § 8(a)(1), the timing of the policy's issuance is not alone sufficient to render such policy unlawful. *See Teledyne Advanced Materials*, 332 NLRB at 539. Therefore, the Court finds Petitioner has not presented sufficient evidence to show a likelihood that the speech prohibition violates § 8(a)(1).

//

1

2        *iii.*    *Threat*

      Employers have a First Amendment right to communicate with their employees, which

3 cannot be abrogated by a union campaign. *Gissel*, 395 U.S. at 617; 29 U.S.C. § 158(c).  An

4 employer may freely express "any views, argument, or opinion" about a union without

5 committing an unfair labor practice "so long as such expression contains no threat of reprisal or

6 force or promise of benefit in violation of § 8(a)(1)." *Id.* (internal quotations omitted).  "In

7 determining whether questioned statements are permissible . . . the statements must be

8 considered in the context in which they were made and in view of the totality of the employer's

9 conduct." *NLRB v. Marine World USA*, 611 F.2d 1274, 1277 (9th Cir. 1980).

      When an employer offers a prediction about the effects of unionization, "the prediction

10

11 must be carefully phrased on the basis of objective fact to convey an employer's belief as to

12 demonstrably probable consequences beyond his control . . . ." *Gissel*, 395 U.S. at 618.  "If

13 there is any implication that an employer may or may not take action solely on his own

14 initiative for reasons unrelated to economic necessities and known only to him, the statement is

15 no longer a reasonable prediction based on available facts but a threat of retaliation based on

16 misrepresentation and coercion, and as such without the protection of the First Amendment."

17 *Id.*

      Petitioner argues that CWF unlawfully threatened its employees when saying "a lot of

18

19 [the Union] guys are sitting at home right now," because the statement communicated a threat

20 of job loss or futility. (Pet. Temp. Inj. 22:1–23:9).  CWF contends there is no evidence it ever

21 indicated that joining the Union would be futile or that it otherwise threatened reprisal against

22 employees who supported the Union. (Resp. 15:14–25).

23       The Court finds that there is no evidence the statement was a threat of reprisal.  The

24 statement was an impression that unionized employers, and therefore union employees, were

25 not receiving sufficient work in September for all their employees to remain in the field.  There

is no indicia that the statement indicated that CWF would fire employees or refrain from sending them to job sites if the employees joined the Union.  Rather, the statement was an objective comment on the market for services from similar unionized business.  Additionally, there is no evidence in the record that any employee other than Christianson interpreted the statement as a threat.  Christianson substantially misquoted the statement in his testimony, indicating that he did not accurately remember the content of the statement he believed to be threatening. (Apr. 7 Hearing Tr. 368:19–20, Ex. B to Resp., ECF No. 6-1) (recalling that the Clarks "did say at one point that they would shut the doors, you know, along those lines."). Given the lack of evidence that the statement was anything more than Coltin's opinion of the effect of unionization on the market for CWF's services as deduced by the present demand for other unionized employers' services, Petitioner has not shown a likelihood of success on his unlawful threat theory.

*iv.    Confiscation*

"Employees have a well-established right to possess union literature." *Manor Care of Easton, Penn., LLC*, 356 NLRB 202, 204 (2010).  "[C]onfiscation of union literature by an employer can interfere with employees' Section 7 rights[.]" *Id.*  Generally, an employer's forcible collection or destruction of union literature qualifies as prohibited confiscation. *See, e.g.*, *Union Tank Car Co.*, 369 NLRB No. 120, slip op. at 1 (2020); *Intertape Polymer Corp.*, 360 NLRB 957, 969 (2014).

Petitioner argues that Coltin unlawfully confiscated Union literature by asking an employee to "let me grab those pamphlets from you" at the conclusion of the September 10 meeting. (Pet. Temp. Inj. 24:8–25:16).  Petitioner contends that because the exchange occurred in front of all CWF's employees, the exchange was unlawfully coercive. (*Id.*).  CWF responds that the employee initially volunteered the literature, and Petitioner has failed to take testimony of the employee who offered the literature. (Resp. 16:1–14).

The Court finds Petitioner has not shown a likelihood of success on this theory.  The recording of the exchange indicates that Coltin asked to see the pamphlets without hostility. The Clarks' testimony supports the inference, as the Clarks testified that the employee volunteered the pamphlet on the day preceding the meeting. (Apr. 6 Hearing Tr. 39:10–20, 83:6–12, 101:21–23, Ex. A to Resp., ECF No. 6-1).  There is no indication that, by asking for the pamphlet, Coltin sought to prohibit employees from possessing the literature, nor that employees were likely to interpret the gesture to mean they could not possess the same.  Given that the employee voluntarily offered the pamphlet, and CWF did not interfere with employees' right of possession, Petitioner has not shown that CWF unlawfully "confiscated" the pamphlet.

### 2.    8(a)(3)

Section 8(a)(3) of the NLRA prohibits employers from discriminating against employees because of their membership in or support of a labor organization. *See* 29 U.S.C. § 158(a)(3). Courts employ a burden-shifting analysis for § 8(a)(3) claims wherein, "Petitioner must show that employees were engaged in union activities, Respondent knew of these activities, and harbored the requisite anti-union animus." *Overstreet ex rel. NLRB v. Gunderson Rail Servs, LLC*, 5 F. Supp. 3d 1073, 1082 (D. Ariz. 2014) (reversed in part and vacated in part on other grounds).  Once petitioner makes a prima facie case of unlawful termination, the showing generates a presumption that the employee's protected conduct was a "motivating factor" in the employer's termination decision. *See Healthcare Emples. Union, Local 399 v. NLRB*, 399 F.3d 909, 917 (9th Cir. 2005) (quoting *Wright Line*, 251 NLRB 1083 (1980), *enforced*, 662 F.3d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989 (1982).  The employer then must demonstrate a legitimate, nondiscriminatory reason for the termination, indicating that it would have taken the action irrespective of the protected activity. *Peter Vitalie Co., Inc.*, 310 NLRB 865, 871 (1993); *see also Healthcare Employees Union, Local 399 v. NLRB*, 463 F.3d 909, 923 (9th Cir. 2006).

Petitioner's § 8(a)(3) claim concerns Ralls's termination. (*See* Pet. Temp. Inj. 26:1–33:20). A discussion of the events that Petitioner highlights in support of his § 8(a)(3) theory follows.

When Ralls first began working for CWF in December of 2019, he worked as a full-time helper in CWF's shop, and he also assisted HVAC welders in the field. (Oct. Ralls Aff. ¶¶ 1, 4, PX 5); (Apr. 6 Admin. Hearing Tr. 264:7–267:10, PX 12). Ralls had long been a supporter of the Union even before the Union began its campaign to organize CWF's employees; his father was a member of the Union, and Nilson was aware of Ralls's father's membership in the Union. (Oct. Ralls Aff ¶¶ 6–7, 9, PX 5); (Apr. 6 Hearing Tr. 120:14–20, 137:22–138:12, 268:23–269:9, 334:14–336:12, PX 12). When the Union began reaching out to many of CWF's employees, Ralls was on a vacation. (Oct. Ralls Aff. ¶¶ 5–6). During Ralls's vacation, Christensen contacted Ralls to inform him of the Union's campaign, and Ralls said he was interested in the campaign and asked for the Union representative's contact information. (*Id.*). Despite being told to return from his vacation no later than September 7 because CWF had a large project starting at the Henderson Multi-Generational Center, Ralls was not on the weekly work schedule for an entire week upon returning from vacation. (*Id.* ¶¶ 5, 8); (*see also* Apr. 6 Admin. Hearing Tr. at 271:14–275:9, PX 12).

On September 8, Ralls met with Peck to learn more about the Union. (Oct. Ralls Aff. ¶¶ 9–10). At the meeting, Ralls signed his Union authorization card. (*Id*). After signing the authorization card, Ralls asked Nilson why he was not on the work schedule, but Nilson did not provide a reason. (*Id.* ¶ 11); (Apr. 6 Admin. Hearing Tr. 275:10–20, PX 12). Ralls discerned from CWF's mobile scheduling application that he was the only employee who had his working hours reduced that week. (Apr. 6 Admin. Hearing Tr. 326:21–327:10, PX 12). On September 10, after the employee meeting underlying Petitioner's § 8(a)(1) claims, Nilson texted Ralls to let him know he was scheduled for a job in Laughlin, Nevada from September

21–23. (Ex. 1 to Aff. Michael Ralls dated April 5, 2021 ("Apr. Ralls Aff."), PX 7, ECF No. 1-5); (Apr. 6 Admin. Hearing Tr. 286:2–287:9, PX 12).

On September 15, two representatives from the Union met with the Clarks to discuss the Union's offer to represent CWF's employees. (Decls. Austin and Coltin Clark ¶¶ 2–4, PX 11, ECF No. 1-7); (Apr. 6 Admin. Hearing Tr. 427:24–432:1, PX 12).  The Clarks declined. (Decls. Austin and Coltin Clark ¶¶ 2–4, PX 11); (Apr. 6 Admin. Hearing Tr. PX 12 430:14–22).  On the same day, Ralls had been scheduled to work in CWF's shop. (Oct. Ralls Aff. ¶ 18, PX 5) (Apr. 6 Admin. Hearing Tr. 287:10–289:14, PX 12).  Shortly after Ralls arrived to work, Coltin directed Ralls to Coltin's office, where the Clarks and Nilson informed Ralls he was being laid off. (*Id.*).  Coltin said that Ralls was being laid off during the colder months until HVAC work picked up again, and Ralls's termination notice indicated he was being laid off due to lack of work. (*Id.*).  Despite the purported lack of work, CWF hired two employees to assist with HVAC and boiler work; jobs allegedly similar to those Ralls had previously performed. (Apr. 6 Admin. Hearing Tr. 56:21–57:23, 126:3–129:3, 133:4–137:21, 361:22–363:24, PX 12).

As CWF does not dispute that Ralls engaged in union activity and that CWF held anti-union animus, the Court considers whether Petitioner has sufficiently shown CWF's knowledge of Ralls's union activity.  The Court alternatively considers whether CWF has met its burden to show it terminated Ralls for a legitimate, non-discriminatory reason.

### i.   *Knowledge*

Petitioner concedes there is no direct evidence that CWF knew of Ralls's union activity, but Petitioner argues that the Court can infer knowledge from CWF's general knowledge of employees' union activities. (*Id.* 29:16–30:12).  Petitioner further argues that management knew of Ralls's father's ties to the Union, which supports the proffered inference with respect to Ralls. (*Id.* 30:13–31:2).

Petitioner also explains that circumstantial evidence indicates that Ralls's firing was retaliatory. Petitioner highlights the temporal proximity between CWF learning about the Union's organizing and Ralls's firing as evidence the events were likely connected given the absence of evidence that CWF previously considered terminating Ralls's employment. (*Id.* 31:18–32:2).[8] Additionally, Petitioner infers that Peck's meeting with the Clarks at which Peck sought Union recognition likely motivated Ralls's firing that same day. (*Id.* 32:3–10).

In Response, CWF contends that its management had no knowledge of Ralls's union activities, so it could not have fired Ralls for engaging in protected activity. (Resp. 17:14–18:12). CWF also argues that Petitioner's circumstantial case lacks support. (Resp. 18:13–19:3). CWF notes that Petitioner seeks to demonstrate CWF's knowledge of Ralls's Union support through CWF's purported knowledge of Ralls's father's position in the Union. (*Id.*). However, CWF responds that with respect to the Clarks, only Coltin met Ralls's father before discharging Ralls, and neither of the Clarks knew of Ralls's father's role in the Union until questioned by charging counsel at the administrative hearing. (*Id.*); (Apr. 6 Hearing Tr. 83:25–84:6, 120:8–20, Ex. A to Resp.).

The Court finds that Petitioner has not shown a likelihood that the Clarks knew of Ralls's Union activity. Petitioner's evidence of the Clarks' knowledge is specious. In his Reply, Petitioner stakes the Clarks' alleged knowledge on one piece of testimony indicating that Coltin was a close friend of Ralls and his older sister, and he once met Ralls's father. (Reply 5:18–6:1) (citing Apr. 6 Hearing Tr. 120:8–18, PX 12). Petitioner impliedly argues the Court should find it likely that purportedly close friends should be expected to know whether their friends' parents are involved with a labor union. However, the Clarks testified under oath that they did not know Ralls's father was in the Union at the time of Ralls's discharge. (Apr. 6

---

[8] Petitioner also argues that CWF's threats demonstrate anti-union animus, but the Court previously concluded that Petitioner has not made an adequate showing that the alleged threats qualify as threats under § 8(a)(1). (*See* Mot. Temp. Inj. 31:3–16).

Hearing Tr. 83:25–84:6, 120:8–20, Ex. A to Resp.).  As Petitioner makes an unsupported inference about the Clarks' knowledge that is contradicted by testimony to the contrary, the Court finds that the Clarks likely did not know Ralls supported the Union.

However, Nilson testified that Ralls had spoken to him many times about Ralls's father's membership in the Union. (*Id.* 6:1–2) (citing Apr. 6 Hearing Tr. 137:22–138:12, PX 12).  Petitioner argues, and CWF does not dispute, that Nilson is an agent of CWF within the meaning of the NLRA. (Pet. ¶ 11, ECF No. 1).  Nilson also testified that he played a role in the decision to terminate Ralls. (Apr. 6 Hearing Tr. 136:8–9, PX 12).  Accordingly, to the extent the Court may impute Nilson's knowledge to CWF, there is at least some evidence from which CWF could infer Ralls's support for the Union.

### ii.   *Legitimate, Non-Discriminatory Reason*

Even if Petitioner has made a prima facie showing that CWF discharged Ralls because of his support for the Union, CWF argues that it terminated Ralls for legitimate, nondiscriminatory reasons. (Resp. 19:4–21:16).  CWF contends that work in the shop had slowed down during COVID, and Ralls lacked the skill for CWF's HVAC foremen to use him in the field. (*Id.*); (*see also* Apr. 6 Hearing Tr. 54:21–55:9, Ex. A to Resp., ECF No. 6-1) ("Work in the shop had slowed down due to COVID.  So we tried to put him with other foremen, on other crews, and it was not working out.  [Christenson] had come to me and said that he liked Michael Ralls, just couldn't work with him.  And that's a small crew, so Mike said we had to find someone else . . . . [the] HVAC side just couldn't use him in the capacity they needed.").  HVAC supervisor Nilson provided testimony to the same effect. (Apr. 6 Hearing Tr. 155:10–156:7, Ex. A to Resp.) ("he was let go for lack of work.  My concern was he was not evolving from a helper to a technician.  He was not retaining knowledge.  He was not learning.").  Coltin also testified that Christianson asked for Ralls to be taken off his crew, and Ralls was terminated because the work he was suited for in the shop had slowed. (*Id.* 109:23–

110:5) ("we did slowdown in that timeframe. [Christianson and the company], we kind of moved him around trying to find a good fit for him in the Company.  Gary in the shop was struggling with him, and then [Christianson] asked, specifically asked, his supervisor, Mike Nilson, to get him somebody else that can help him out better.").

CWF provides payroll records to show that work in the shop had, in fact, slowed down before Ralls's termination.  In the four weeks preceding Ralls's layoff, he only had one week where he worked at least 40 hours, and there was one week he worked as little as seven hours. (Payroll Records at 1529–35, Ex. N to Resp. ECF No. 6-2).  Gary Morgan, who also worked in the shop, worked few hours during the same period. (Apr. 8 Hearing Tr. 471:3–7, Ex. C to Resp., ECF No. 6-1).  And, in the three weeks following Ralls's termination, Morgan did not have a single week where he worked over 40 hours, including one five-hour week immediately following Ralls's termination. (Payroll Records at 1520–25, Ex. N to Resp.).  CWF contends that its hiring of new employees following Ralls's termination is irrelevant to the amount of work available.  CWF explains that Ralls was only qualified to work in the shop, work in the shop had slowed down, and CWF's new hires performed HVAC field work. (Resp. 20:23–21:16).  Although Ralls had previously performed similar work, he had been taken off those jobs because he could not perform to the standard required by the foremen. (*Id.*); (Apr. 6 Hearing Tr. 61:5–8, Ex. A to Resp.) (indicating that the new employees were a certified electrician and a certified HVAC technician with refrigerant licensing); (Apr. 6 Hearing Tr. 109:14–22, Ex. A to Resp.) (indicating that Christenson requested CWF hire someone to help him more effectively than Ralls, ultimately leading CWF to hire someone with more HVAC experience).

Petitioner contends that the proffered reason for Ralls's termination is suspect given that Ralls was told to return from vacation on September 7 for a job, he was assigned to another job on September 21, and he was hired during the coldest part of the year — a time that likely

presented low demand for HVAC work. (Pet. Temp. Inj. 32:17–33:9).  And, given that CWF hired two new helpers with duties that overlapped with Ralls's previous work, there was no slowdown in work meriting Ralls's termination. (*Id.* 33:9–17).

  The Court is persuaded that CWF terminated Ralls for a legitimate, non-discriminatory reason.  Petitioner's rebuttal conflates Ralls's two roles—helping in the field with HVAC work and helping in the shop.  Petitioner does not dispute that work in the shop had slowed down, and he instead puts all his eggs in the HVAC basket.  However, CWF provides evidence that Ralls was sidelined from HVAC field work because he did not have the necessary skills, and HVAC foremen did not want to work with him. (Apr. 6 Hearing Tr. 54:21–55:9, 109:23–110:5, 155:10–156:7, Ex. A to Resp.).[9]  Accordingly, Ralls's September assignments to HVAC jobs are irrelevant to the availability of work if he was asked to be removed from HVAC crews before the jobs commenced and there was little work available in the shop.  In the field, Ralls was replaced by new employees who were certified technicians who could provide Christianson the help he needed. (Apr. 6 Hearing Tr. 61:5–8, Ex. A to Resp.).  CWF's uncontroverted testimony and payroll records shows that work was slow in the shop, and CWF terminated Ralls's employment because work had slowed in the shop.  While Ralls may have been told he was being laid off until HVAC work picked up again, the evidence indicates that CWF did not accurately explain to Ralls why he was being let go.  The disjuncture between the actual reason for Ralls's termination and the explanation provided to Ralls does not suffice to show some possibility of success on the merits given the strength of CWF's evidence in support of the reason for termination.  Accordingly, the Court finds that CWF has met its rebuttal burden to show it terminated Ralls for a legitimate, non-discriminatory reason.

---

[9] Although Ralls was previously assigned to work on other jobs before his termination, it appears that he was not ultimately placed on those crews because the foremen did not want to work with him.

The Court finds that Petitioner has not met his burden to show a likelihood of success on the merits on any of his claims.  The Court therefore briefly turns to irreparable harm.

**B.      Irreparable Harm**

To prevail on his § 10(j) Petition, the Regional Director "must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." *Frankl ex rel. NLRB v. HTH Corp.*, 650 F.3d 1334, 1355 (9th Cir. 2011) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  "In the context of the NLRA, 'permit[ting  an] alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority is irreparable harm.'" *Id.* at 1362 (quoting *Miller*, 19 F.3d at 460).  "[W]hile a district court may not presume irreparable injury with regard to likely unfair labor practices generally, irreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief." *Frankl*, 650 F.3d at 1362.

Here, as the Court has found that Petitioner has not demonstrated a likelihood of success on the merits, Petitioner likewise cannot show a likelihood of irreparable harm.  Given that Petitioner has not shown CWF has likely engaged or is engaging in unfair labor practices, there are no deleterious effects from unfair labor practices that would cause irreparable harm to CWF's employees' collective bargaining rights.  While support for the Union has declined from its peak, Petitioner has not shown that the decline in support was the result of unfair labor practices.  As Petitioner has neither shown a likelihood of success on the merits nor irreparable harm absent the issuance of an injunction, the Court need not analyze the remaining factors and must deny the Petition. *Cf. Rubin ex rel. NLRB v. Vista Del Sol Health Servs.*, 80 F. Supp. 3d 1058, 1075 (C.D. Cal. 2015).[10]

---

[10] If the Court were to assess the balance of hardships, the hardship to CWF created by an injunction would far outweigh the need to vindicate the rights implicated by Petitioner's unmeritorious claims.

## IV.    <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that the Petition for Temporary Injunction, (ECF No. 1), is **DENIED**.

**IT IS FURTHER ORDERED** that the Motion to Try Petition on the Basis of the Administrative Record, (ECF No. 3), is **GRANTED**.

**IT IS FURTHER ORDERED** that the Motion for Leave to File Excess Pages, (ECF No. 4), is **GRANTED**.

Dated this _19_ day of July, 2021.


_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT